The next case today is Jose Cecilio Ruiz Varela v. William P. Barr, appeal number 19194. Mr. Olin. Good morning, your honors. Randy Olin for Mr. Ruiz Varela. May I reserve three minutes of rebuttal time, please? Yes. Thank you. Mr. Ruiz Varela worked in his father's business in Honduras. It was a pool hall and a bar. He was the only family member to do so. At some point in time, some corrupt members of the national police attempted to extort his father for protection money for the business. His name is Mr. Bantute. Despite his concern that his family members might be harmed if he refused to do so, he did refuse. In response to that refusal, the police told him that they would close his business and kill his son, Mr. Ruiz Varela. Mr. Bantute continued to resist paying the extortion and threatened to make the extortion demands public. Soon thereafter, Mr. Ruiz Varela was ambushed at a roadside checkpoint by some of the same police officers who had made the extortionate demands. He was shot in the leg, he was beaten so that his ribs were broken, and he had a gun put to his head and threatened with death. Contemporaneous with the attack, or shortly thereafter, Mr. Bantute, his father, went to what is called the Justice of the Peace Criminal Division, something of a police report. In that police report, he stated both that his son had been threatened for his failure, Mr. Bantute's failure to meet the extortion demand, and also that one of the police officers had told him that the attack on his son was only a warning and that if Mr. Bantute did not pay, the next time his son would be killed. After his recovery from his injuries, Mr. Ruiz Varela continued to receive threats. He continued to be followed and harassed by members of the police. At that point in time, Mr. Bantute closed his business temporarily and sent his son to the United States. In removal proceedings in the immigration court, he applied for withholding of removal. He claimed that his past persecution was on account of his membership in the particular social group of his immediate family with Mr. Bantute, a particular social group that has been recognized as a cognizable particular social group for over a generation. He claimed that he was persecuted solely because of his status as his father's son. The BIA decision found him to be established a nexus between the harm and the family relationship. And counsel, just on that issue, what is the standard of review as to the factual findings? Isn't it substantial evidence? Meaning, isn't it more deferential than it would be as to legal by the substantial evidence standard? But I would note, Your Honor, that by any standard, it's clearly erroneous and let me explain why. The board's decision rested on three bases. The first one was that Mr. Ruiz Varela had not identified any specific particular animus toward his family, toward Mr. Bantute's family. Well, I believe that being shot, having your ribs broken and a gun put to your head is pretty firm evidence of an animus toward Mr. Bantute's family. More to the point, I have quoted at length Judge Barron's dissent from the denial of the motion to stay because he has addressed all these issues, all the issues that the agency raised and the government raised in a way, quite frankly, that I doubt that I could match in any event. I guess my question is, and obviously, I've read Judge Barron's dissent as well. I guess my recollection was there was a focus on whether or not the actions at the barricade were, there was enough of a nexus there. I guess that's what I'm focused on in understanding the argument about the family being a social group for the purposes of the petition, but isn't there, wasn't there a factual basis here based on the immigration judge's assessment of credibility about whether or not there's a nexus in the actual precipitating event? I don't believe that is, I'm sorry Judge, I don't believe that is in question because the immigration judge himself in his decision stated that this could be, first of all, he found Mr. Ruiz-Varel to be credible, but secondly, he stated himself that this could very well be an act of persecution based on the family or it might be something else, but I don't think there's any question about the factual connection there. If I can, with respect to the second reason that the board did not support Mr. Varel's claim and it was because the rest of no one else in his family was harmed and that is easily, I think, answered because there's not anything in the record to show that the police knew who his family members were. What about when they were at the hospital? I'm sorry Judge. I thought when they were at the hospital, the whole family, the police were at the hospital as well. They were there, but there's nothing in there that would show that they identified them as his immediate family. Well, who would they thought they were? It could have been anybody. It could have been anyone in that room, Judge. And again, to very briefly quote Judge Barron, aside from that point, Judge Barron says, I do not see a basis for construing the nexus requirement to embrace the troubling notion that the sins of the father may be visited upon the son as long as they are not visited upon anyone else in the family. And I think that is an accurate assessment of the law. And he cites the Cordova case for the proposition that just because other members of the family are not persecuted does not undermine his own fear of persecution. Go ahead, Judge Howard. The complicating factor for me here, though, is that is the son's connection to the business. And, you know, obviously we're not sitting as a Nissi Prius court deciding the facts ourselves, but it does complicate for me this notion that, you know, had there been evidence that any of the other members of the family had been targeted, that might mean something else. But is just the statement that you don't have to have targeting of the other family members enough to sort of overcome this business connection that the son has, at least in terms of the substantial evidence standard? I believe, Judge Howard, you are closing in on what is the real fundamental issue in the case, and that is that the board determined that because both Mr. Ruiz-Varela and Mr. Matute were targeted for extortion at the business, that that creates an inference that they were targeted only as a means to increase wealth. Well, that position, and that's really the fundamental ruling of the agency, that would have some force if it were true. But the fact of the matter is, Mr. Ruiz-Varela was never a target of the extortion. He was a target of the persecution, and he suffered past persecution to be sure. But there is nothing in this record to even suggest that the police were trying to extort Mr. Ruiz-Varela rather than his father. They were certainly after his father for money, but Mr. Ruiz-Varela, the son, was not subjected to an extortion demand. There's nothing in the record to show that he could pay it. Nothing in the record to show that anything like that was directed to him. Nothing in the record to show that he resisted. If we accepted your argument, then would we have to say that the BIA as a matter of law is compelled in every ordinary kidnapping case to find persecution on account of family membership? In other words, someone kidnaps a child or a spouse and then makes a Would you say then that that's on account of their family status? I don't know if that's entirely analogous to a situation like this, which involves extortion. Let me put it to you this way. Well, no, tell me how it's not analogous. You're suggesting that every person who was kidnapped, what would be the reason for the kidnapping? Well, suppose the police just drove up to this pool hall, kidnapped the son, and sent a note saying, we're torturing him or we're going to kill him unless you send us $1,000. Well, I think that in all likelihood that would settle the nexus requirement. So that would be true in virtually every kidnapping of a family member case? I don't know. I wouldn't want to speculate about that, Judge. I think every case would have to be looked at on its own facts. But let me ask this question. If in fact he was not subject to the extortion, why was he harmed? Why was he persecuted? There's only one logical reason, because they were trying to get to his father through the son. And that's a critical distinction. And I think that at the very least, although I don't think this is a mixed motive case, but at the very least, it could be construed to be a mixed motive case. They may have been looking to increase their wealth on the basis of their extortion of the father, but certainly they were persecuting the son to influence the father to have leverage over the father. And I think the case law is virtually monolithic in circumstances like that, that that is the quintessential example, classic example of a particular social group based on nuclear family, immediate family. You seem to be missing an animus too, don't you? Their aim is to get money from the father. The son could be best buddies with them and their best friend, but they still decide that's a way to get will kidnap him and get money from the father. Well, that's not the fact pattern in this case. And I don't know that that would really change anything, your honor, if they are, if his membership in the social group, if his membership in that immediate family is the motive, one central reason for why they are harming him, seeking to harm him, whether they're best friends or not, that qualifies under the particular social group rubric. So you're arguing that does not have to be any animus? Well, I think that there's clearly, well, there's in this case, there's certainly animus in this case, that we're not talking about speculative harm or potential harm. We're talking about broken ribs, shot, gun to the head. So they're clearly animus in this case. But as Judge Barron said that, you know, that identifying this as a particular social group, a cognizable social group does not rely on whether or not there was hatred toward the family, like the Montague's head toward the Capulets or the Hatfield toward the McCoys. So I don't even really, I'm not really clear on the whole idea of how animus is an important factor, but in any event, we certainly have it in this case. If it were needed. You've reserved some time, Mr. Olin. I think we will hear from Good morning. May it please the court. My name is Julia Tyler and I represent the respondent, the government in this immigration case. Your honors, the sole issue in this case is whether substantial evidence supports the agency's conclusion that Mr. Ruiz did not carry his burden of demonstrating that he was persecuted on account of his membership in the Ruiz-Varela family. The government believes that substantial evidence does support that conclusion and asked the court to deny the petition for review. I'd like to start my presentation by keying off some of the points that Mr. Olin made in his in his presentation. And I'd like to start with one question that he posed to the panel. Why was Mr. Ruiz-Varela harmed? And that we do not need to speculate about why Mr. Ruiz-Varela was harmed. Because in his testimony, he was asked, and you can find this at page 150 in the record, he was specifically asked, why exactly do you think you were shot by the police? And Ruiz replied to that question that he was shot because we refused to pay protection on the part of the police. Now, that is critical because one of the other things that I think Mr. Olin neglected to mention was that before the agency, he had two theories of nexus. Yes, he had the family relationship. Actually, it was the family, the Ruiz-Varela family. But secondly, it was his opinion. His opinion against extortion is not illegally, it's not, does not constitute a protected ground under the act. But his argument was that he had an opinion, his father had an opinion, and if the police didn't know his specific opinion, his father's opinion of opposing extortion was imputed to him. And in that vein, I would direct your attention to this 12th page of the record. And this is the brief before the board. And on that last page, Mr. Ruiz-Varela notices that his political opinion was clear. His father refused to pay extortion. And then here I'm quoting, and was necessarily implicated. His son was necessarily implicated because he worked and lived with his father. So he was necessarily implicated in his father's refusal to pay the extortion, which is precisely why Mr. Ruiz-Varela said, and the immigration judge noted it in his oral statements before he issued his decision, and then again in his decision, the precise testimony of the petitioner that he was shot because we, we refused to pay protection to the police. Now, I would love to go through a couple of the other points that he made, Mr. Olin made, keying off of Judge Barron's dissent in this case. Again, I would also highlight that the standard being applied in a stay motion is not the same as substantial evidence or whether the evidence that Mr. Olin is stressing compels a contrary conclusion to that highlighted. The first is the reference in Mr. Matute's statement to Mr. Ruiz as his son. He said, Mr. Matute says in his statement, and this is at page 194 of the record, he says, the police threatened me saying that if I did not pay, they would kill my son. Now, the first thing that's important to remember about that is that that's not a direct quote. He's using the word I, so he's obviously paraphrasing what the police officer said. And Mr. Matute didn't testify in this case. So we don't know, we were not able to ask Mr. Tutute, well, specifically, how did the police phrase that? Did they refer to your son as Jose, or did they just refer to him as your son? We do not know that from this page of the record. And Judge Kayada, as you mentioned in your decision, the majority's decision on the state response, it's entirely possible that the reference to the son was simply a handy way to refer to them, given the fact of their relationship. The use of the word son is also interesting because Mr. Matute had two sons. So in his statement, if the police did use the word son, it would presume that his next question should have been, which son? Except Mr. Matute knew which son he was talking about. He knew that the police were referring to the son that worked in the pool hall, and that was seen as jointly refusing to submit to the extortionist demands. I'll next move to the point that these extortionist demands were only directed at the It really doesn't matter who actually received the threats, or who did the specific refusing of paying the extortion money. Because as Mr. Ruiz testified at page 125 of the administrative record, he was in the pool hall with his father on many occasions when the police came in. So they were seen together, whether or not the police were physically talking to the father or not. They were seen in the pool hall together. In addition, Judge Barron and Mr. Olin highlight a lack of evidence that the police, in trying to extort the father, threatened to harm anyone other than the son. Again, this is a meaningless distinction because only his son worked at the pool hall. And finally, Mr. Olin stressed the fact that there was no evidence, or seemed to imply that there was no evidence in the record that the police knew who his other family members were. There's a tremendous amount of evidence in the record that that is not the case. First, his mother lived in the house attached to the pool hall with Mr. Ruiz Varela and Mr. Matute for 30 years. Secondly, the other son lived next door. Every single one of his siblings also lived in Sabah, Cologne. And his daughter lived 20 minutes away. The other is a point I think you mentioned, Judge Howard, which is that his family was all around him in the hospital the morning after the shooting. It is quite, it almost restrains credulity to say that there would be no way to know who those people were. This is an individual who was in handcuffs, according to Mr. Ruiz Varela's testimony. He was handcuffed to his bed with police and prosecutors in the room. I highly doubt that individuals, just random individuals, would be allowed to be in a hospital room with a suspect who is in police custody and is handcuffed to the bed. Just for the record, that was Judge Kayada's question that pointed that out, but I'm actually more interested in another of Judge Kayada's questions, which is distinguishing this case, you'd have to change the facts of this case, but what about the kidnapping extortion attempts? Are those persecution? Well, whether or not kidnapping itself rises to the level of persecution is, of course, another issue. I don't mean to get technical, but I think that that is sort of the quagmire that we're in with these particular social groups based on family. Yes, but I take the problem here to be that the facts that you have pointed to that suggest a joint enterprise between the father and the son and the we evidence would all be irrelevant in the kidnapping extortion of the parent case. Well, if there's a kidnapping of a child of a parent to get at the parent, and I mean, it's Judge Kayada's question, but I'm very interested in your view of those situations. Well, if I may, Your Honor, I think that that comes down to the Attorney General's decision in matter of AB. It comes down to the decision in matter of LEA, and I think it's very important to discuss the issue of animus. Are you simply using someone as an incentive to get someone to pay extortion money, or do you actually have an animus towards the family? In this case, there is no animus towards the family that was expressed. Let me make this important point, because I think what Mr. Olin was doing in his presentation was conflating the severity of the harm that Mr. Ruiz Varela experienced being shot at, being beaten, etc., and animus. Now, one of the things that came up in this case was the immigration judge highlighted that one of the only things that the police ever said was when they came back around after the beating, after he was released from the hospital, he came around to the pool hall where Mr. Ruiz Varela was sitting outside, where he recuperated for a year and basically sat outside the pool hall that entire time, and on one occasion, the police came by and said to the other policemen, that's the one I told you about, and the immigration judge very astutely said, that doesn't show me anything. Now, one of the cases we do have, and you'll have to forgive me if I forget the name of it, but there was a case in which a child was abused by family members, and he was claiming that it was because of his relationship to his mother, and in that case, the family member said, you know, you're this no good person, son, we hated her, she was, I hate to use the word, she was a whore, etc., etc., so there was clearly animus expressed towards this woman and towards her family, and that this child was caught up in that, and that is clearly lacking. I mean, the immigration judge pointed out, the only thing we have here is a sentence where one cop says to another cop, he's the one I told you about, so that's not really enough to go on. I have a technical question for you. The IJ specifically found, as to the checkpoint shooting, that the evidence was ambiguous as to whether that occurred because of the extortion or instead occurred simply because he ran the checkpoint, and he concluded that the petitioner had not carried his burden of proving that it was the former. The BIA, I don't think, unless I missed something, didn't make express reference to that finding. Of what significance is that finding to us now on review? I think that what the immigration judge was saying, and this is in the record at 26, the IJ said that the motive may have been mixed, that he was targeted for his refusal to be extorted, but also possibly because the police perceived him as running a roadblock. The board did not specifically mention that. I would say, you know, neither one of those reasons that may have been implicated in the immigration judge's mind are protected grounds, so I think that the fact that the board did not specifically reference that other conceivable motivation makes any difference to this court's analysis because neither of those would be a protected ground under the statute. So, in other words, the immigration judge really just threw in another unprotected ground, one being refusal to pay the extortion and two that he eluded the police. Are there any other questions for me, your honor? I don't see any. You do have two minutes left if you want them or you can concede your time back. Actually, I was just going to reiterate that with Mr. Olin conflating the severity of the harm with actual animus towards the actual family, and I think there's another way to examine this, and I sometimes think in my mind, what if Mr. Ruiz Varela, instead of working at the pool hall, had been an adolescent in school and had had nothing to do with his father's business, and the police officers had come up to him and said, we're going to get you because, you know, you're that terrible man's son and we hate your family and we think your family doesn't play by our rules and we're going to come, you know, we're going to come get your family because they are flouting the law against the police and we're the authority. In other words, if you had animus and you also had, you also didn't have this relationship of being involved with the actual business that was being extorted, and I think that the facts that you have in this case bring it so much closer to the case that the board actually cited in its decision, Aguiar Deguian, where the was persecuted on account of family and this court agreed with the board that no, she was being persecuted and threatened because she worked with her husband at the store. I think it's also important that, again, that there was no, there were no threats directed towards the other individuals in the family. There's no evidence in the record that they were ever harmed, which brings this very close also to a case that was recently decided by this court, Loja Tin, in September of 2020, where the brother was threatened, but none of his, but his one, but none of the others, none of his sisters had been threatened. And the court relied on that as well as being a significant factor in finding that his family relationship was not a basis for his persecution. Thank you so much, your honors. The government asks that the court please deny the petition for review, and I appreciate your time and attention. All right. Thank you. If you would mute, Mr. Olin. It appears we have this camera issue again. Shall I try and resolve that? There we go. In an administrative record spanning 450 pages, the government hangs its hat on one use of the royal we by Mr. Ruz Varela, and when asked why he thought he was shot, and he said, because we didn't pay the extortion. Well, Judge Barron was not very moved by that. He said there was nothing in the context surrounding that one statement that provides the least bit of support for treating it as an admission that the police were seeking payment from the son, or even that he himself had manifested any resistance to the attempted extortion. More to the point, let me fill in some blanks for Ms. Tyler on this issue of whether or not he was subject to extortion. In his testimony and affidavit, Mr. Ruz Varela said that the police said that they would close, speaking of his father, would close his business if he did not pay. He said that the police began attempting to extort my father to protect his business. He also testified that the local police prosecuted me because I am my father's son, and my father refused to pay for the protection. Mr. Matute's affidavit said I was the object of the attempted extortion. Police came asking me for money in exchange for protection for my business, and after the attack on his son, when he went to the justice of the police to file a report, he stated that the police wanted to charge him for his business, and the attack on his son was retaliation for his refusal. If you balance those two evidentiary submissions, Your Honor, I think you inexorably come to the conclusion that that statement does not indicate that he was subject to extortion. Again, that's the critical distinction that makes the board's decision wrong. They were not looking to increase their wealth by way of Mr. Ruz Varela, only his father. The government just spoke about the fact that he shared his father's opposition to extortion. Well, I am very confident that every single business owner in the country of Honduras believes that has that same shared I'm sorry, Judge. It seems we lost him. He seems to have frozen. We're going to try and get him back. I'm going to ask IT to please pause the YouTube stream. Thank you. Mr. Olin, are you with us? I am. Yeah, one second. We're just going to make sure that the recording and the streaming has started again before you go ahead. Can we confirm that? I'm here. Yes. IT, can you confirm that we're back live again? You have one more minute to wrap up, Mr. Olin. Okay. Thank you. Thank you, Your Honor. With respect to Ms. Tyler's claim that the police knew about the family, there is no evidence in the record that the police had any idea who the rest of the family was. I believe, Judge Howard, it was your question about them all being in the hospital room together. We don't have a lot of information about that, but I can tell you what we do not have. We do not have any evidence, even in the hospital room, that the police, the corrupt police, knew that that was the rest of the family. And that goes to animus. You can't really demonstrate animus toward people when you don't know who they are. Finally, Your Honor, if this case is remanded as I believe it should be, there is no question in the agency acknowledged that the treatment that Mr. Ruiz Varela received constituted past persecution. So on remand, he should have the presumption of future persecution, the well-founded fear of future persecution, based on the past persecution. If there's nothing further, I'll rest on my brief. Very well. We'll take the case under advisement. Thank you. That concludes the argument in this case. Attorney Olin and Attorney Tyler, you should disconnect from the hearing at this time.